Exhibit A

## 2074CV00037 Stonebridge Building and Design, Inc. vs. Randall, Lynn M. et al

- Case Type:
- Contract / Business Cases
- Case Status:
- Open
- File Date
- 11/17/2020
- DCM Track:
- F - Fast Track
- Initiating Action:
- Services, Labor and Materials
- Status Date:
- 11/17/2020
- Case Judge:
- 
- Next Event:

| All Information | Party | Tickler | Docket | Disposition |

### Party Information

**Stonebridge Building and Design, Inc.**
- Plaintiff

| Alias |

**Party Attorney**
- Attorney
- Schultz, Esq., Hilary S
- Bar Code
- 447640
- Address
- Schultz Law, LLP
- 231 Chief Justice Cushing Hwy
- Suite 203
- Cohasset, MA  02025
- Phone Number
- (617)951-9980

**More Party Information**

**Randall, Lynn M.**
- Defendant

| Alias |

| Party Attorney |

**More Party Information**

**Randall, III, Arthur**
- Defendant

| Alias |

| Party Attorney |

**More Party Information**

### Ticklers

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---|---|---|---|---|
| Service | 11/17/2020 | 02/16/2021 | 91 | |
| Answer | 11/17/2020 | 03/17/2021 | 120 | |
| Rule 12/19/20 Served By | 11/17/2020 | 03/17/2021 | 120 | |
| Rule 12/19/20 Filed By | 11/17/2020 | 04/16/2021 | 150 | |
| Rule 12/19/20 Heard By | 11/17/2020 | 05/17/2021 | 181 | |
| Rule 15 Served By | 11/17/2020 | 03/17/2021 | 120 | |
| Rule 15 Filed By | 11/17/2020 | 04/16/2021 | 150 | |
| Rule 15 Heard By | 11/17/2020 | 05/17/2021 | 181 | |
| Discovery | 11/17/2020 | 09/13/2021 | 300 | |
| Rule 56 Served By | 11/17/2020 | 10/13/2021 | 330 | |
| Rule 56 Filed By | 11/17/2020 | 11/12/2021 | 360 | |
| Final Pre-Trial Conference | 11/17/2020 | 03/14/2022 | 482 | |
| Judgment | 11/17/2020 | 11/17/2022 | 730 | |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 11/17/2020 | Attorney appearance<br>On this date Hilary S Schultz, Esq. added for Plaintiff Stonebridge Building and Design, Inc. | | |
| 11/17/2020 | Case assigned to:<br>DCM Track F - Fast Track was added on 11/17/2020 | | |
| 11/17/2020 | Original civil complaint filed. | 1 | Image |
| 11/17/2020 | Civil action cover sheet filed. | 2 | Image |
| 12/09/2020 | Amended: amended complaint filed by Stonebridge Building and Design, Inc. | 3 | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF DUKES COUNTY, ss

SUPERIOR COURT DEPT.
OF THE TRIAL COURT  2074CV00037

---

STONEBRIDGE BUILDING &
DESIGN, INC.,
      Plaintiff

v.

LYNN M. and ARTHUR
RANDALL, III
      Defendants

Docket No. 2074 CV 00037

FILED
SUPERIOR COURT
COUNTY OF DUKES COUNTY

NOV 17 2020

REC'D

_____ CLERK.

## COMPLAINT

The Plaintiff brings this complaint to recover the compensatory damages it has incurred as a result of the Defendants' failure and refusal to pay the Plaintiff for the construction renovation work it performed at the Defendants' property in Tisbury, Massachusetts.

### Parties, Jurisdiction and Venue

1.     The Plaintiff, Stonebridge Building and Design, Inc. ("Stonebridge"), is a duly established Massachusetts corporation with its principal place of business on Martha's Vineyard in the County of Dukes County.  Stonebridge's business is residential and commercial construction.  Stonebridge is licensed as a Massachusetts Home Improvement Contractor.

2.     Harold Chapdelaine, who is Stonebridge's sole shareholder, sole director, and holder of all of Stonebridge's corporate offices, is a duly licensed Massachusetts Construction Supervisor.  He has worked as a licensed Construction Supervisor and contractor more than 30 years.

3.     The Defendants Lynn and Arthur Randall (hereafter collectively, "the Randalls") are upon information and belief husband and wife, residents of the State of New Jersey, and the

1

owners of real property located at 130 Hines Point Road in Tisbury, Massachusetts ("the Hines Point Property" or "the Property"). The Randalls purchased the Hines Point Property in May 2014.

4.     This court has jurisdiction over this lawsuit pursuant to Mass. G.L. c. 212,  §4, c. 214 § 1 and c. 223A, § 3.

5.     Venue is appropriate in the County of Dukes County pursuant to Mass. G.L. c. 223 § 1 and c. 214 § 5.

### Facts Common to All Counts

6.     In late January 2017, Mr. Chapdelaine learned of the Randalls from a real estate broker. The Randalls and Mr. Chapdelaine spoke for the first time, by telephone, on or about January 25, 2017.

7.     During that first telephone call, Mrs. Randall stated that she and her husband were interested in having renovations done to the Hines Point Property, summarized the renovations they wanted done in 2017, and asked if Mr. Chapdelaine would be interested in providing them with a renovation proposal. Mrs. Randall told Mr. Chapdelaine about drawings that had been prepared by an architect or interior designer, Joan Boone ("Boone Drawings"); Mrs. Randall indicated that the Randalls wanted to do the extensive renovations shown on the Boone Drawings but in phases. Mr. Chapdelaine indicated he was interested in the project and would try to provide them with a proposal before he left Martha's Vineyard for a two-week vacation. Mr. Chapdelaine asked the Randalls to provide him with the Boone Drawings and authorization to inspect the Hines Point Property personally so that he could prepare a proposal. The Randalls did both.

8.     After he examined the Boone Drawings, Mr. Chapdelaine concluded that they were only schematic designs and not actual permit-ready or construction drawings. He nevertheless considered them when he developed a renovation proposal for the Randalls. He also considered the "existing conditions" photographs he had taken of the rooms at the Hines Point Property. In the days after January 25, 2917, Mr. Chapdelaine spoke several times by telephone with Mrs. Randall about the extent of the potential renovations; he also made several follow-up visits to the Property and worked intensively—at night and on both weekend days—to prepare a proposal. During this time period, Mr. Chapdelaine explained to the Randalls that the Hines Point Property was located in a "very sensitive location" in Tisbury, explaining that the use and the extent of renovations that the Town would permit as of right were restricted. He noted in particular that any enlargement of the house's footprint and the increase in the number of new windows reflected in the Boone Drawings would require hearings and approval by several Town Boards before a building permit would be issued. The Randalls directed Mr. Chapdelaine to limit his proposal so it would not automatically trigger regulatory review.

9.     On January 30, 2017 Mr. Chapdelaine presented the Randalls with a proposal for specified renovation work on both floors of their home (hereafter "the Original Proposal"). The Original Proposal was based on his multiple discussions with the Randalls, the information he had gathered during his several visits to the Property, the Boone Drawings, his knowledge of building practices, and his more than thirty years of experience as a home builder. The Original Proposal was in Excel format and separated the renovations that the Randalls requested  into different segments (*e.g.*, removal of existing stairs and elevator, replaced with new multiple landing interior stairwell fabricated by others; replacement and installation of thirteen new windows; renovation of the master bathroom and one half bathroom; reconfiguration of the two

3

bedrooms on the lower level and installation of three windows in the family room; installation of a new boiler for heating, and a new cooling/dehumidification system for lower level). Within each segment, the Original Proposal listed specific work that Stonebridge's employees would perform, identified the Stonebridge employees, and their hourly rates, the time likely necessary for particular tasks, the anticipated charges by the subcontractors and tradesmen Stonebridge would be using (*e.g.*, drywall installation, plumbing, interior painting, floor refinishing, and specific electrical work—relocating the existing electrical service and installing new wiring for lighting fixtures the Randalls would provide), and the costs of key materials (*e.g.*, window costs, the new minisplit cassette, stairwell fabrication, framing lumber and trim by board foot, and sheetrock or drywall by the square foot). The Original Proposal broke out separately general construction tasks that Stonebridge personnel would perform (*e.g.*, permitting, project management, demolition, framing, and carpentry) and noted the materials the Randalls had already indicated they wanted to supply themselves: light fixtures and bathroom fixtures and accessories.

10.     The Original Proposal included the following notation presented in a boldface font on the first page on a line directly under the date: "Estimate for renovations to be finalized between Owner, Designer and Builder". This notation was included because the Original Proposal did not include, for example, the cost of any of the new flooring as the Randalls had not yet selected the tile they wanted or whether to replace or only refinish their existing wood flooring. The total estimated costs of the work covered by the Original Proposal was $294,158.50 to which Mr. Chapdelaine added a 5% overhead and profit factor rather than the industry-typical factor (which in his experience was 15%), bringing the total price quoted for the

Original Proposal to $308,866.43. Mr. Chapdelaine offered the Randalls the steep overhead and profit discount as an incentive for them to award the job to Stonebridge.

11.     Mr. Chapdelaine transmitted the Original Proposal to the Randalls electronically with an explanatory email, dated January 30, 2017. That email stated in pertinent part that the "pricing [in the Original Proposal] is generous and we would not go over the estimate . . . All is doable by mid May if we are able to start ASAP.  If you want to move forward I will meet with the building inspector before I leave for vacation and I could have the crew complete all the necessary interior demolition while I am away. . .We bill for actual costs so this [pricing] is a maximum unless you change the scope or we find unforeseen hidden issues beyond what we have outlined."

12.     The Randalls did not accept the Original Proposal until after Mr. Chapdelaine returned from his vacation, at which time Mrs. Randall told him they wanted to proceed and that she was sending him a deposit check, dated February 22, 2017.  By the time Mr. Chapdelaine received Mrs. Randall's "go ahead", the ambitious mid-May probable completion date referred to in Mr. Chapdelaine's January 30, 2017 email was already three weeks out of date.  The first day of Stonebridge's work was February 23, 2017.

13.     Mrs. Randall informed Mr. Chapdelaine multiple times that she preferred to communicate by telephone even after he explained the reasons why he preferred to rely primarily on emails. He explained that in his experience communicating with clients by email or text message was more effective and efficient than phone calls and minimized the interruption of day-to-day work. Electronic communications also had the benefits of enabling him to easily track decisions and the progress of Stonebridge's work and send his clients progress photos that he took nearly every workday. Throughout Stonebridge's work at the Hines Point Property, Mrs.

Randall primarily communicated her decisions, questions, and comments by telephone; Mr. Chapdelaine relied on a mix of text messages and emails to supplement his conversations with her.

14.     On February 21, 2017, Mrs. Randall sent Mr. Chapdelaine a lengthy email.  After repeating that she was "on board with doing the [interior] stairs, getting rid of elevator and trying to get more space in the downstairs bedrooms [and] I also want to change the two upstairs bathrooms", she posed several questions: "Should we demo the wall between kitchen and LR if we are not doing the kitchen now?"; "what do we do about the outdoor shower and the outside staircase that connects the patio and the deck?"; what was the cost of adding more windows to the project; and how could the house's two street entrances be changed to be "aesthetically pleasing"?  The Original Proposal did not include any of the items noted in her questions.

15.     When Mr. Chapdelaine reminded Mrs. Randall that items not part of the Original Proposal would be billed based on time and materials, her only response was urging him to proceed with preparing a second proposal—the projects that became the Expanded Scope (see below). Their conversation is an example of the pattern of communication between Mrs. Randall and Mr. Chapdelaine that persisted throughout the months that Stonebridge worked essentially non-stop on renovating the Hines Point Property from top to bottom. Mrs. Randall called him multiple times each week, often daily and more than once a day.  Typically, she invariably initiates her calls with a question--"what if we do X?" or "what about Y?"—where "X" and "Y" were extras or upgrades, not part of the parties' existing agreement.  Sometimes she asked for an estimate—which Stonebridge invariably provided if circumstances reasonably allowed; sometimes she acknowledged that the additional work she was requesting was beyond the scope of the Original Proposal or the Expanded Scope; most often she simply issued instructions

6

signifying her implicit authorization for Stonebridge to perform the additional work, saying "the house deserves it."

16.     On February 26, 2017, after numerous phone conversations, Mr. Chapdelaine emailed the Randalls a second estimate for specific additional renovation work ("Expanded Scope"). As he had done with the Original Proposal, Mr. Chapdelaine summarized the Expanded Scope in his email and sent detailed information in Excel format that broke down the four major elements—installing twenty-three additional windows throughout the house (thus increasing the original thirteen to thirty-six; subsequently she added ten more new windows bringing the total to forty-six), retiling the lower level floors, installing new wood flooring on the main floor, and remodeling the kitchen, laundry and adding a half bath—by work tasks, labor costs, subcontractor estimates, and materials' estimates. The Expanded Scope stated Stonebridge's maximum prices for the specified work and again reflected a 5% overhead and profit factor. On March 7th, Mr. Chapdelaine modified the pricing for the Expanded Scope to reflect updated information about the cost of remodeling the kitchen and laundry and adding a half bath. The estimated maximum price for the Expanded Scope as modified was $260,191.08, making the new total cost of performing both the Original Proposal and the Expanded Scope $569,057.51 (*i.e.* $308,866.43 + $260,191.08).

17.     The email that Mr. Chapdelaine sent on February 26, 2017 with the Expanded Scope noted certain "other considerations". These were items that he and Mrs. Randall had discussed that would further impact the overall project timeline but were still undecided: "interior contents and set up, window treatments, increase the deck size, living room ceiling, outside shower and deck stairs". Ultimately, Mrs. Randall requested that Stonebridge perform all of these extra items and more.

7

18.     Mr. Chapdelaine reminded Mrs. Randall that the decision to more than double the number of new windows to be installed from the number specified in the Original Proposal would trigger a review by Tisbury's Site Planning Board Site Plan Review Committee and require a lengthy written submission to the Planning Board. The Randalls requested that he move forward with the work and proceed with the additional permitting tasks on the assumption they would receive Planning Board approval for the additional windows.  Mrs. Randall personally sourced, ordered and purchased all of the additional windows; she selected a New Hampshire vendor so the Randalls could avoid paying Massachusetts' sales tax.

19.     Mrs. Randall decided that as a way to control costs, she would also personally purchase key materials for the project in addition to purchasing the windows: the cabinetry for the kitchen and bathrooms from a New Jersey company; all of the flooring tile and stone for the counters; and the wood flooring.  Because Mrs. Randall's direct involvement in the ordering of materials would inevitably affect the pace and completion of the work defined in both the Original Proposal and the Expanded Scope, Mr. Chapdelaine explicitly reminded her in early March that the timing of her purchases would directly affect the pace of Stonebridge's work. Mr. Chapdelaine stressed to Mrs. Randall multiple times that order lead times for the items for which she was assuming supply responsibility were critical to the pace of Stonebridge's work progress.

20.     For example, Mrs. Randall chose custom rather than stock cabinets, with inset doors rather than overlay doors as Stonebridge had proposed, to avoid humidity issues and to control costs.  Mrs. Randall decided instead to replicate the look of the cabinetry in her New Jersey kitchen, a considerable price upgrade over what Stonebridge had proposed, and to use that type of cabinetry in the bathrooms and laundry rooms as well. Mr. Chapdelaine reminded her that the typical lead time from order placement to delivery alone for such custom orders was

8

eight to ten weeks, with installation including countertops requiring an additional three to four weeks. Mrs. Randall nevertheless attempted until very late in April 2017 to source the cabinetry through a New Jersey supplier. At the end of April, she switched gears and instructed Mr. Chapdelaine to order the cabinets from his Martha's Vineyard based supplier. He did, and that delay set back work on several elements of the renovation work, as the cabinets were not delivered to the Hines Point Property until July 1st.

21.     Beginning in late February 2017 and continuing throughout Stonebridge's work, the Randalls added an expansive array of renovation projects and upgrades ("Upgrades") beyond the scope of the renovation work defined in the Original Proposal and the Expanded Scope. Most of these Upgrades had been added to Stonebridge's workload by early May 2017 and included the following: adding a shower in the second bathroom being remodeled; completely renovating the full bathroom on the lower level; adding a custom window in the master bathroom shower; adding wall tile in every bathroom and the laundry room; installing 47 recessed lighting fixtures throughout the house, relocating and rewiring light switches when the hallways were widened and stairwell was redesigned, upgrading the smoke detection system, and adding new appliances and other items that increased the house's overall electrical load requirements; building custom bookcases in the study/den flanking the existing fireplace chase and a recessed area for a wall-mounted television; renovating the main floor front entry foyer by removing existing windows and building an owner's closet and custom entry bench over the space uncovered when elevator removed; widening and building arched openings between several additional main floor rooms; boxing the ceiling beams in  the living room and master bedroom; widening lower level hall; adding a second laundry room on lower level; replacing all of the decking outside and rebuilding the outside stairs; refurbishing the existing metal fireplace by

reducing the height of the hearth, adjusting the chimney height at the roof, remodel the surround and convert the fireplace to gas; and finishing the water damage repairs to the lower level family room that another contractor had started but not completed.

22.     The Randalls added yet more Upgrades during the Summer—*e.g.*, rebuilding/renovating the two street entrances; adding furniture toekicks to all of cabinets; removing and replacing all of the cabinet knobs and drawer pulls on the dining room credenza (finish change); changing the height of the kitchen cabinet shelves from the factory placement so they aligned with the muttin bars in the glass door panels; upgrading the dining room built-ins; removing and replacing all of the door hinges two separate times (finish change); power washing and clear coat sealing the shingles; and installing new downspouts to divert rainwater and snow melt away from the house.

23.     Stonebridge also encountered unforeseen conditions during the course of construction--such as uncovering rot when old windows were removed—and that led to other additional renovation work.  Additional renovation work relating to unforeseen conditions included the installation of structural beams in the garage to support the kitchen floor; leveling the floors on the lower level and in the kitchen to ensure new tile would lay flat; resurfacing portions of the roof; and rebuilding the exterior staircase.

24.     Each of the added renovation elements generated its own increases in specific labor and materials costs; they also had ripple effects on and caused significant increases in other renovation costs.  These underlying added costs showed up in the following categories of work: framing, drywall, support and finish carpentry, plumbing, tile work, additional electrical work (rewiring, additional service capacity and Code compliance), exterior painting, and project management.

25.     Upon information and belief, Mr. Randall knew of all the Upgrades and additional work that Mrs. Randall had instructed Stonebridge to perform. Both Mr. and Mrs. Randall knew that the changes that Mrs. Randall had requested added time to the project as well as additional costs.

26.     Mr. Chapdelaine sent an itemized color-coded Excel spreadsheet on April 7, 2017 that specifically identified the additional work that Stonebridge had already begun through March (the billing period), based on employee timecards, his daily summaries, materials invoices and subcontractor invoices.  Mr. Chapdelaine explained in the email he sent with the April 7, 2017 invoice that he had provided extensive detail about Stonebridge's work to enable the Randalls to "see where your money is going" and to give them "a clear vision of how costs are incurred and accounted for."  The April 7 invoice specifically noted in several places, "[t]his cost will increase with the increase in scope of the additional work."  Mrs. Randall thanked him for all the detail; the Randalls paid the invoice without commenting on any of the additional costs.

27.     The Randalls made at least nine in-person visits to the Hines Point Property during the period of April through Labor Day weekend and two visits after Labor Day.  Mr. Chapdelaine also regularly communicated with Mrs. Randall—by text message and telephone—throughout the Summer keeping her informed about the progress of Stonebridge's work, providing estimates for some of the additional work she requested and discussing specific cash flow needs for deposits (materials and tradesmen).  During the period February through October 2017, Mr. Chapdelaine sent the Randalls hundreds of progress photos to keep them informed about the pace and substance of Stonebridge's work.

28.     Mrs. Randall frequently sent Mr. Chapdelaine text messages praising the quality of Stonebridge's renovation work.  For example: April 22 – "The house has had a beautiful

11

transformation. It looks wonderful"; <u>June 1</u> – "the house looking wonderfully transformed"; <u>June 27</u> – "Wow terrific progress"; <u>July 14</u> – "Thanks for your time today—it helped to talk as your insights on fireplace were great and made terrific sense"; <u>July 17</u> "You are doing a fantastic job – it looks wicked awesome";  <u>July 30</u> – "I am so glad you changed the fireplace – it makes a tremendous difference in the room"; <u>September 4</u> – ". . . the girls were talking about how amazing the house looks. Emma turned to Lucy and said 'I must tell you, Mr. Chapdelaine is a true genius.'"

29.     The changes in scope of the renovation work that had the greatest impact on the overall price of the Randalls' project were the following: the complete redesign of the interior stairwell from what was reflected in the Original Proposal (changing the height of each stair from standard height, increasing the length of the run, increasing the number of balusters from two to three per tread, and adding wainscoting); widening additional room transitions and hallways, lowering ceiling heights and boxing in the ceiling beams in two rooms; fully renovating a third full bathroom; rebuilding the two street entrances; increasing the existing electrical load (*e.g.*, having 47 recessed lights installed rather than owner-supplied surface mounted fixtures and relocating switches); requiring the purchase and installation of new milled nine-piece interior trim for the new windows and doors rather than having Stonebridge reinstall the flat four-piece interior trim it had carefully removed, cleaned and inventoried so it could be reused as the Randalls initially requested; power washing and sealing the entire exterior of the house; and changing the layout and other design elements of the lower landing and steps to the new bluestone patio three times—twice after the staircase was built—to suit the Randalls' design preferences.

30.     Throughout the Spring and Summer of 2017, Stonebridge personnel including Mr. Chapdelaine worked continually on the Randall project.  He regularly worked alongside Stonebridge's other employees into evenings and on weekends, did not take any vacation time, and barely took any time off to deal with two major family crises.  In addition to construction tasks, Mr. Chapdelaine agreed to Mrs. Randall's request that he negotiate with her flooring supplier about the inferior product that it had been supplied, and he regularly answered her questions about interior design decisions (*e.g.*, would a certain table fit in the remodeled kitchen, would a certain bed fit in the bedroom, or which shade of gray paint would complement the additional light being introduced through the new windows?).  He worked continuously despite the pain of a torn elbow tendon (not diagnosed until October).

31.     Stonebridge worked virtually exclusively on the Randall project from February through August 2017, taking on no "construction" clients and deferring work requested by existing clients. For seven months, the prime construction season, Stonebridge only worked on the Randall project and a few short emergency service projects for established clients.

32.     The Randalls made the progress payments that Mr. Chapdelaine requested without any comment through the end of August 2017.  The first time the Randalls expressed any "concern" to Mr. Chapdelaine about the amount of increased renovation costs was in an email that Mrs. Randall sent on September 2nd, two days before Labor Day. The Randalls were coming to Martha's Vineyard for the holiday weekend and had already been informed that Stonebridge's renovation work at the Hines Point Property would be "substantially complete" as of Labor Day.  While some work was done by Stonebridge employees after Labor Day to complete some of the Upgrades that the Randalls had requested—*e.g.*, changing shelf heights in the kitchen cabinets, installing the new kitchen cabinet hardware that Mrs. Randall ordered on

13

August 17, installing toekicks that Mrs. Randall ordered after the cabinets were installed, installing hardware for the dining room credenza that Mrs. Randall ordered on October 17, and finishing the built-in bookcases—the only major project still unfinished as of Labor Day was rebuilding the outside staircase from the deck to the stone patio.

33.     Mrs. Randall was aware that the total payments she had made as of the end of August did not nearly equal the costs and charges of Stonebridge's renovation work. When Mrs. Randall asked Mr. Chapdelaine the day before the Randalls came to Martha's Vineyard for that holiday weekend for an accounting, he responded that it would take him at least two weeks "to pull everything together" for an up to date project accounting; he did not speculate how long it would take him to translate the backup information into an invoice. At the end of the Randalls' several hour Labor Day visit to the Hines Point Property with Mr. Chapdelaine, Mrs. Randall took him aside, standing next to her car out of everyone else's earshot and asked, "how much am I going to owe?" He responded, "It is a lot of money; north of $200 thousand"—but he did not ask for any payment at that time. She nodded and walked to the rear of her car without making any comment. Later that same day, she sent him a laudatory text repeating again her family's appreciation for how "amazing the house looks".

34.     Throughout October 2017, Mrs. Randall continued to order items that Stonebridge needed to complete the renovation project; however, she failed to make critical decisions –*e.g.,* what lighting fixtures to hang above the kitchen island, above the kitchen table, above the bathroom vanities, in the dining room and outside; where the electrician should install the ground fault receptacles in the master bathroom and laundry room; where to mount towel bars in the bathrooms and whether to change the trim in the master bathroom shower to match the mixing valve or change the location of the mixing valve itself.

14

35.    In October 2017, Mrs. Randall notified Mr. Chapdelaine "the house needs to be finished at least two weeks prior" to Thanksgiving.  Mr. Chapdelaine assured her that the work could be completed by November 10th so long as she finally made a firm and final decisions about what she wanted in the master bathroom shower.  Mrs. Randall had continually changed her mind about the design of the master bathroom shower even after it was essentially finished.  As of November 10, 2017, Mrs. Randall had still not made a firm decision.  Moreover, the Randalls also did not come to Martha's Vineyard for Thanksgiving.

36.    Mr. Chapdelaine's preparation of a detailed accounting was delayed as the result of his extensive "hands on" work on the Randall's project (at the expense of his customary "office" time"); certain personal issues and a computer glitch that resulted in the need for a re-entry of data that had previously been entered onto the computer also somewhat contributed to the delay.  Nevertheless, on November 21, 2017, completed his detailed accounting of Stonebridge's work and project expenses during the period from April 7 through November 17, 2017.  As of the latter date, Stonebridge had completely finished all of the renovation work that had not been completed by Labor Day—the principal item in that latter category had been the outside staircase—and most of the punch list items Stonebridge had identified, the ones that Mrs. Randall had requested, and the ones the Randalls pointed out with blue painter's tape during their Labor Day visit.

37.    The November accounting document was, like the April 7, 2017 accounting document, in Excel format and meticulously detailed.  It specifically identified costs related to the Original Proposal, the Expanded Scope of the project, all of the Upgrades, and extra work necessitated by unforeseen conditions.

38.     The November 21, 2017 accounting (as corrected on December 8th) shows the following information:

|  | Original Proposal | Expanded Scope (3/7/2017) | Owner-added extras and unforeseen conditions | Totals |
|---|---|---|---|---|
| Estimate | $308,866.43 | $260,191.83 | Time and materials | |
| Actual amounts billed by Stonebridge* | $257,473.15 | $166,356.32 | $439,515.59 | $863,345.04 |
| Value of Owner-supplied materials** | $22,050.00 | $76,376.49 | N/A -reflected in time and materials | |
| Total Amount Paid to Stonebridge by Randalls | | | | $597,845.00 |
| Net Amount Owed by Randalls | | | | $265,500.04 |

\* - Amounts billed did not include Owner-supplied items

\*\* - These are the Stonebridge allowances in Original Proposal and Expanded Scope for items the Randalls supplied.

39.     Mr. Chapdelaine emailed the accounting to Mrs. Randall on November 22, 2017. After explaining how the accounting was organized and what information it contained, his email stated, in pertinent part,

> As you know the scope of the work increased considerably with many additions to the project . . . I have kept the cost plus 5% formula throughout the billing format which translates into a substantial savings, our normal billing is 'cost plus 15%'. Originally this was intended for the original project of the stairs, master bath and lower bedroom reconfigurations. I then extended it to include the kitchen portion. I also did not add 5% to the value of the Owner provided products, windows, flooring, tile .... a further savings for you.  Given the project extended from an anticipated completion of mid June into

early October this savings to you comes at loss of income for me. We, the crew and the subs have worked diligently to provide you with a great value, quality workmanship and a new home we hope brings you and your family years of enjoyment . . . Certainly you will need time to review the invoice however a partial payment is needed and would be appreciated as all of the subs are due a portion of the remaining balance.

40.     When Mrs. Randall and Mr. Chapdelaine spoke briefly on November 30, 2017, she told him she was not ready to discuss the accounting and he did not press her. Instead, she complained about the shower controls layout, the type of sealer used on the exterior shingles, and the log selection for the gas fireplace. Mr. Chapdelaine reminded her that she had been involved in those decisions but agreed to think about a way to resolve the disagreements on her other points. A few days later he sent her a proposed new layout for relocating the shower controls reiterating his previous proposal that Stonebridge would not charge for its labor or materials costs to making that change, but only charge for the plumber's and painters' time. She failed to respond. On December 4, 2017, he sent her an email proposing several "proportionate" and specific retainages pertaining to the sealant, the gas log selection and the other items she had questioned.

41.     Mr. Chapdelaine's December 4, 2017 email reminded Mrs. Randall that "you knew the scope of the project was increasing and cost would be associated with these additions and changes". He also told her that Stonebridge had already performed nearly $8,000 of punch list work that he classified as "unbillable 'final detail'" . . . to meet both your expectations and my standards of craftmanship"; and reiterated that "the project is well beyond substantial completion." Mr. Chapdelaine acknowledged that "the final invoice was late" but also reminded her he had disclosed the serious "personal issues that contributed to" that timing. She did not respond to his email.

42.     Stonebridge continued to perform punch list work during December 2017 and
January 2018 even though the Randalls had not yet made any payment om the November
invoice, and Mr. Chapdelaine kept Mrs. Randall informed of that work.  On December 8, Mr.
Chapdelaine re-sent the November 22, 2017 invoice corrected to reflect a payment by the
Randalls he had inadvertently omitted.  On January 24, 2018, he sent Mrs. Randall an email
noting the last few punch list items that remained due to persistent backorders and a vendor
error, with an new iteration of the November 22 invoice that included freight charges that
Stonebridge had paid for items she ordered and that for the first time reflected a "finance change
in the amount of $3,994.82 on the open balance from December 22, 2017."  Three days later, on
January 27, 2018, Mrs. Randall sent Mr. Chapdelaine an email and a duplicate text message,
stating in pertinent part, "I do not want any further work being done at my house (by you, your
employees or your subcontractors) until you and I have had a chance to review the final invoice."
In his January 27th response, Mr. Chapdelaine texted "[p]er your request we will not enter your
home without your permission."  In her reply, she confirmed, "I will be in touch."  The Randalls'
next communication with Stonebridge was a c. 93A demand letter.

43.     The main premises of the demand letter were that Stonebridge had abandoned the
Hines Point Property renovation after Labor Day, was seeking payment of hundreds of thousands
of dollars for work to which the Randalls never agreed, and performed substandard work.  The
facts belie each of these self-serving accusations.

44.     The allegation in the c 93A demand letter that Stonebridge abandoned the Hines
Point renovation is demonstrably false.  Stonebridge personnel, including Mr. Chapdelaine,
worked approximately 650 manhours during August to complete the renovations so the house
would be substantially complete when the Randalls came to Martha's Vineyard for the holiday

weekend. The sole renovation work of any magnitude that was incomplete was the exterior

stairs—which were not the sole means of accessing the patio from the house and which

Stonebridge personnel ultimately built/rebuilt three times to suit the Randalls' preferences. When

the Randalls at the last minute decided they did not want to stay at the Hines Point Property

during the Labor Day weekend because much of their new furniture was not going to be

delivered in time, Mr. Chapdelaine arranged for them to stay in a house that Stonebridge then

owned at no charge. He then spent several hours on the holiday walking through the Hines Point

Property with the Randalls and their children.  Each of the Randalls expressed delight with how

Stonebridge had transformed the house.

        45.    From Labor Day through the date of the final invoice, Stonebridge personnel

continued to work diligently at the Hines Point Property primarily on exterior projects.  They

worked more than 300 manhours (not counting) primarily in September—completing the

exterior staircase, installing gutters to prevent future water damage and rot, and power-washing

and restaining the shingles—often working eight to ten-hour days. Approximately half of those

hours—150 manhours—were devoted exclusively to work on the exterior stairs.  The post-Labor

Day hours noted do not include Mr. Chapdelaine's 40 plus hours of project management work—

including his making design suggestions and generating sketches that Mrs. Randall solicited and

his acting as the receiving agent for the Randalls' new furniture; those hours also does not reflect

the more than 100 manhours on punch list work for which the Randalls were not billed.  The

painters worked more than 100 hours after Labor Day on the house exterior and repainting rooms

at Mrs. Randall's request. When the Randalls visited the Hines Point Property twice in October,

the changes that Stonebridge personnel continued to make after Labor Day were obvious.

46.     The "punch list" attached to the demand letter is comprised almost exclusively of items that the Randalls prevented Stonebridge from completing as a result of the Randalls' own failures to select locations or provide long-promised materials.  The Randalls' list also does not accurately reflect the punch list work that Stonebridge personnel did perform.

47.     The demand letter conceded that Mr. Chapdelaine's January 30, 2017 email—the parties' very first substantive written communication—stated in plain language that the Original Proposal "is a maximum unless you [the owners] change the scope or we find unforeseen hidden issues beyond what we have outlined."  The demand letter nevertheless asserted that Stonebridge never "advised" the Randalls of the "expanding scope of their project."  That assertion is demonstrably false.

48.     Stonebridge's work was of the highest quality and not even remotely sub-standard.  The allegation that Stonebridge's work was substandard is particularly incongruous given the language used to describe the quality of Stonebridge's renovation work that is contained in the real estate advertisements about the Hines Point Property that have been published since January 2018.

49.     The sole example that the Randalls' attorney used to illustrate his accusation that Stonebridge's work was substandard—the condition of the main level's new wood flooring—is particularly telling.  In January or February 2017, Mr. Chapdelaine had specifically pointed out that because the Hines Point Property abutted Lagoon Pond the house was highly susceptible to the ubiquitous moisture laden environment.  Mrs. Randall made clear from the start of the project that she did not use the main floor's existing air-conditioning system because the Randalls liked to have all the windows open to the breeze off Lagoon Pond.  The Randalls also declined to consider Mr. Chapdelaine's suggestion that they install a dehumidification system for the main

floor like the system being installed on the lower level.  Similarly, they refused to consider his suggested installation of a humidification system for the winter months to counteract the severe drying generated by their radiant and forced hot air heating systems, which had caused observable wood trim shrinkage. To accommodate the Randalls' decisions and to ameliorate some of the potentially severe moisture challenges that Mr. Chapdelaine knew the house had because of its location, he recommended a high-quality engineered wood product for the new flooring on the main floor and gave Mrs. Randall specific product information so she could see it for herself. One of the things he point out was that engineered wood flooring could be refinished to the same extent as solid wood. Mrs. Randall nevertheless insisted on solid wood flooring and sourced it herself.  As it turns out, she selected a low-grade product.

50.     The experienced flooring installer Stonebridge engaged adhered to every manufacturer's specification and used the techniques and materials which in his experience were the best for minimizing the effects of atmospheric moisture. While the other main floor renovations were being completed, the finished floor was covered with two layers of industrial grade protection. When the protection was removed in early August 2017, it was obvious that the main level floorboards had "cupped" to varying degrees in multiple locations.  Mrs. Randall's reaction at that time was that the cause was the product supplied, not the workmanship.  She asked Mr. Chapdelaine to speak with the supplier's representative, seeming to expect that replacement flooring would be offered. The supplier's representative first insisted to Mr. Chapdelaine that the flooring must have been installed with the wrong adhesive or without sufficient spacing from the walls.  Mr. Chapdelaine debunked those suggestions with photographs of the as-installed spacing and the (then) current moisture content readings that showed the flooring as installed was well within the range of moisture tolerances the

manufacture recommended. The supplier had no other suggestion for remedying the problem and expressed hope that the flooring would "lie down" after the first heating season. That phenomenon had not occurred by January 27, 2018, even though heat-induced shrinkage of the new trim—which the painters had started to remedy—had already occurred. The Randalls saw the condition of the flooring when they visited the house on Labor Day and twice in October, but never asked Mr. Chapdelaine to address it.

<strong>Count One – Breach of Contract</strong>

51.     Stonebridge hereby repeats and incorporates by reference each and every allegation in the foregoing paragraphs 1-50 as if fully set forth herein.

52.     The Randalls and Stonebridge entered into an enforceable contract for the Hines Point Property renovation on or about February 22, 2017; to wit, the date of the Randalls' deposit check for the work specifically described in the Original Proposal. The parties' agreement was not limited to the work noted on the Original Proposal or also the Expanded Scope. The parties' agreement also included—as noted on the face of the Original Proposal—any additional work and upgrades that the Randalls thereafter requested and work required to remedy unforeseen conditions Stonebridge encountered during construction that would be charged based on "time and materials."

53.     Beginning on or about February 21, 2017 and continuing throughout Stonebridge's renovation work, the Randalls changed and expanded the scope of the renovation work agreed upon by the parties; to wit, by authorizing the work specified in the Expanded Scope and by requesting numerous additional changes and upgrades in the renovation work both inside and outside their home. The scope of the parties' contract also expanded due to

unforeseen conditions that Stonebridge encountered during construction and brought to the Randalls' attention.

54.     Initially, Mrs. Randall asked Mr. Chapdelaine to consult with Joan Boone about the renovations. Fairly soon after Stonebridge began its work, Mrs. Randall ceased asking Mr. Chapdelaine to consult with Ms. Boone and upon information and belief, Mrs. Randall relied exclusively on Mr. Chapdelaine's design suggestions and her own design decisions. Stonebridge correctly and completely performed every design and construction element of the parties' contract.

55.     The Randalls have refused and failed to pay the net amount reflected in Stonebridge's November 21, 2017 invoice, as corrected: $265,500.

56.     The Randalls intentionally prevented Stonebridge from completing punch list items and barred Stonebridge personnel and tradesmen from the Hines Point Property.

57.     The Randalls' refusal to allow Stonebridge to complete the punch list work and the Randall's refusal to pay the outstanding amount due Stonebridge for the renovation work that it performed constitute material breaches of the parties' contract, as a result of which Stonebridge has suffered damages in an amount to be determined at trial.

### Count Two – Breach of Covenant of Good Faith and Fair Dealing

58.     Stonebridge hereby repeats and incorporates by reference each and every allegation in the foregoing paragraphs 1-57 as if fully set forth herein.

59.     Every Massachusetts contract contains an implied covenant that both parties will act in good faith toward each other and deal with each other fairly.

60.     The Randalls instructed and demanded that Stonebridge continue to perform extensive construction work throughout the time Stonebridge worked on the Hines Point

Property that the Randalls knew was beyond the scope of the Original Proposal and Expanded Scope.

61.     Upon information and belief, the Randalls had no intention of paying Stonebridge for the extra work they had requested or that had been required to remedy unforeseen conditions. The Randalls have benefitted from all of Stonebridge's work for which they have failed and refused to pay in full.

62.     The Randalls' failure and refusal to pay Stonebridge in full for all the work that Stonebridge performed constitutes a breach of the covenant of good faith and fair dealing, for which Stonebridge has suffered damages in an amount to be determined at trial.

### Count Three – Unjust Enrichment/Quantum Meruit

63.     Stonebridge hereby repeats and incorporates by reference each and every allegation in the foregoing paragraphs 1-62 as if fully set forth herein.

64.     Stonebridge substantially performed all of the construction work at the Hines Point Property for the Randalls' renovation project.  The Hines Point Property renovation project was substantially complete as of Labor Day 2017 and except for a small number of punch list items was entirely complete by November 21, 2017.

65.     If and in the event that a court finds that Stonebridge did not substantially complete the renovation work at the Hines Point Property, that circumstance was due entirely to the Randalls' ordering Stonebridge to cease all work as of January 27, 2018.

65.     Stonebridge has paid in full all of the charges for labor, materials and tradesmen's time that are set forth in the November 21, 2017 invoice as corrected on December 8, 2017.

67.     The Randalls have been unjustly enriched not only by the $265,500 shown on the November 21, 2017 invoice, but also by Stonebridge's loss of its usual 15% charge for profit,

which represents the fair and reasonable value of extra work the Randalls demanded and the fair and reasonable value of punch list items that Stonebridge performed without billing for the sole purpose of seeking to get the Randalls to pay what they should have paid under the terms of the parties' contract.

68.     If and in the event a court determines that Stonebridge is not permitted to recover under the parties' express contract, then Stonebridge is entitled to recover under the theory of *quantum meruit* because the Randalls will be unjustly enriched unless they are required to pay Stonebridge the fair and reasonable value of Stonebridge's renovation work.

**WHEREFORE**, Stonebridge asks that the Court

A.     Enter a judgment on the merits in its favor on Count One and award it damages of $265,500 plus prejudgment interest at the statutory rate from and after December 8, 2017;

B.     Enter a judgment on the merits on its favor on Count Two and award it the damages it has incurred as a result of the Randalls' breach of the covenant of good faith and fair dealing plus prejudgment interest;

C.     Enter a judgment on the merits in its favor on Count Three and award it damages of an amount to be determined by the court plus prejudgment interest at the statutory rate from the date of demand; and

D.     Award such other and further relief as the court deems meet and just.

Respectfully submitted,

Hilary S. Schultz, BBO #447640
hschultz@schultzlawllp.com
Schultz Law, LLP
231 Chief Justice Cushing Highway, Suite 203
Cohasset, MA 02025
617 951 9980 (t)

Dated:  November 17, 2020

25

| CIVIL ACTION COVER SHEET | DOCKET NUMBER<br>2074CV00037 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| PLAINTIFF(S): Stonebridge Building & Design, Inc. | COUNTY |
|---|---|
| ADDRESS: Vineyard haven, MA | |

| | DEFENDANT(S): Lynn M. Randall and Arthur Randall, III |
|---|---|
| ATTORNEY: Hilary S. Schultz, Esq., Schultz Law LLP | |
| ADDRESS: 231 Chief Justice Cushing Highway, Suite 203 | ADDRESS: 114 Clarewell Avenue |
| Cohasset, MA 02025 | Montclair, New Jersey 07043 |
| BBO: 447640 | |

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| A01 | Contract - services and goods | F | ☐ YES  ☒ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?   ☐ YES   ☒ NO        Is this a class action under Mass. R. Civ. P. 23?   ☐ YES   ☒ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ............................................................... $ _____
2. Total doctor expenses ................................................................ $ _____
3. Total chiropractic expenses ......................................................... $ _____
4. Total physical therapy expenses .................................................. $ _____
5. Total other expenses (describe below) .................................. Subtotal (A): $ _____

FILED
SUPERIOR COURT
COUNTY OF DUKES COUNTY

NOV 17 2020

REC'D
CLERK

B. Documented lost wages and compensation to date .................................. $ _____
C. Documented property damages to date .................................................. $ _____
D. Reasonably anticipated future medical and hospital expenses .................... $ _____
E. Reasonably anticipated lost wages ...................................................... $ _____
F. Other documented items of damages (describe below) ............................. $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ _____

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

Provide a detailed description of claim(s):

TOTAL: $ 265,500.00

Claims to recover unpaid costs for services rendered - time and materials

Signature of Attorney/ Unrepresented Plaintiff: X                    Date: 11/17/2020

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X                    Date: 11/17/2020

③

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF DUKES COUNTY, ss

SUPERIOR COURT DEPT.
OF THE TRIAL COURT

|  |  |
|---|---|
| STONEBRIDGE BUILDING &<br>DESIGN, INC.,<br>　　　　　　Plaintiff<br>v.<br><br>LYNN M. and ARTHUR<br>RANDALL, III<br>　　　　　　Defendants | Docket No. 2074 CV 00037 |

### AMENDED COMPLAINT with JURY DEMAND

The Plaintiff brings this complaint to recover the compensatory damages it has incurred as a result of the Defendants' failure and refusal to pay the Plaintiff for the construction renovation work it performed at the Defendants' property in Tisbury, Massachusetts.

#### Parties, Jurisdiction and Venue

1.　　　The Plaintiff, Stonebridge Building and Design, Inc. ("Stonebridge"), is a duly established Massachusetts corporation with its principal place of business on Martha's Vineyard in the County of Dukes County.  Stonebridge's business is residential and commercial construction.  Stonebridge is licensed as a Massachusetts Home Improvement Contractor.

2.　　　Harold Chapdelaine, who is Stonebridge's sole shareholder, sole director, and holder of all of Stonebridge's corporate offices, is a duly licensed Massachusetts Construction Supervisor.  He has worked as a licensed Construction Supervisor and contractor more than 30 years.

3.　　　The Defendants Lynn and Arthur Randall (hereafter collectively, "the Randalls") are upon information and belief husband and wife, residents of the State of New Jersey, and the

FILED
SUPERIOR COURT
COUNTY OF DUKES COUNTY

DEC 0 9 2020[1]

REC'D

CLERK

owners of real property located at 130 Hines Point Road in Tisbury, Massachusetts ("the Hines Point Property" or "the Property"). The Randalls purchased the Hines Point Property in May 2014.

4.      This court has jurisdiction over this lawsuit pursuant to Mass. G.L. c. 212, §4, c. 214 § 1 and c. 223A, § 3.

5.      Venue is appropriate in the County of Dukes County pursuant to Mass. G.L. c. 223 § 1 and c. 214 § 5.

### Facts Common to All Counts

6.      In late January 2017, Mr. Chapdelaine learned of the Randalls from a real estate broker. The Randalls and Mr. Chapdelaine spoke for the first time, by telephone, on or about January 25, 2017.

7.      During that first telephone call, Mrs. Randall stated that she and her husband were interested in having renovations done to the Hines Point Property, summarized the renovations they wanted done in 2017, and asked if Mr. Chapdelaine would be interested in providing them with a renovation proposal. Mrs. Randall told Mr. Chapdelaine about drawings that had been prepared by an architect or interior designer, Joan Boone ("Boone Drawings"); Mrs. Randall indicated that the Randalls wanted to do the extensive renovations shown on the Boone Drawings but in phases. Mr. Chapdelaine indicated he was interested in the project and would try to provide them with a proposal before he left Martha's Vineyard for a two-week vacation. Mr. Chapdelaine asked the Randalls to provide him with the Boone Drawings and authorization to inspect the Hines Point Property personally so that he could prepare a proposal. The Randalls did both.

2

8.      After he examined the Boone Drawings, Mr. Chapdelaine concluded that they were only schematic designs and not actual permit-ready or construction drawings.  He nevertheless considered them when he developed a renovation proposal for the Randalls.  He also considered the "existing conditions" photographs he had taken of the rooms at the Hines Point Property.  In the days after January 25, 2917, Mr. Chapdelaine spoke several times by telephone with Mrs. Randall about the extent of the potential renovations; he also made several follow-up visits to the Property and worked intensively—at night and on both weekend days—to prepare a proposal. During this time period, Mr. Chapdelaine explained to the Randalls that the Hines Point Property was located in a "very sensitive location" in Tisbury, explaining that the use and the extent of renovations that the Town would permit as of right were restricted.  He noted in particular that any enlargement of the house's footprint and the increase in the number of new windows reflected in the Boone Drawings would require hearings and approval by several Town Boards before a building permit would be issued.  The Randalls directed Mr. Chapdelaine to limit his proposal so it would not automatically trigger regulatory review.

9.      On January 30, 2017 Mr. Chapdelaine presented the Randalls with a proposal for specified renovation work on both floors of their home (hereafter "the Original Proposal").  The Original Proposal was based on his multiple discussions with the Randalls, the information he had gathered during his several visits to the Property, the Boone Drawings, his knowledge of building practices, and his more than thirty years of experience as a home builder.  The Original Proposal was in Excel format and separated the renovations that the Randalls requested into different segments (*e.g.*, removal of existing stairs and elevator, replaced with new multiple landing interior stairwell fabricated by others; replacement and installation of thirteen new windows; renovation of the master bathroom and one half bathroom; reconfiguration of the two

3

bedrooms on the lower level and installation of three windows in the family room; installation of

a new boiler for heating, and a new cooling/dehumidification system for lower level). Within

each segment, the Original Proposal listed specific work that Stonebridge's employees would

perform, identified the Stonebridge employees, and their hourly rates, the time likely necessary

for particular tasks, the anticipated charges by the subcontractors and tradesmen Stonebridge

would be using (*e.g.*, drywall installation, plumbing, interior painting, floor refinishing, and

specific electrical work—relocating the existing electrical service and installing new wiring for

lighting fixtures the Randalls would provide), and the costs of key materials (*e.g.*, window costs,

the new minisplit cassette, stairwell fabrication, framing lumber and trim by board foot, and

sheetrock or drywall by the square foot). The Original Proposal broke out separately general

construction tasks that Stonebridge personnel would perform (*e.g.*, permitting, project

management, demolition, framing, and carpentry) and noted the materials the Randalls had

already indicated they wanted to supply themselves: light fixtures and bathroom fixtures and

accessories.

10.     The Original Proposal included the following notation presented in a boldface

font on the first page on a line directly under the date: "Estimate for renovations to be finalized

between Owner, Designer and Builder". This notation was included because the Original

Proposal did not include, for example, the cost of any of the new flooring as the Randalls had not

yet selected the tile they wanted or whether to replace or only refinish their existing wood

flooring. The total estimated costs of the work covered by the Original Proposal was

$294,158.50 to which Mr. Chapdelaine added a 5% overhead and profit factor rather than the

industry-typical factor (which in his experience was 15%), bringing the total price quoted for the

Original Proposal to $308,866.43.  Mr. Chapdelaine offered the Randalls the steep overhead and

profit discount as an incentive for them to award the job to Stonebridge.

11.     Mr. Chapdelaine transmitted the Original Proposal to the Randalls electronically

with an explanatory email, dated January 30, 2017. That email stated in pertinent part that the

"pricing [in the Original Proposal] is generous and we would not go over the estimate . . . All is

doable by mid May if we are able to start ASAP.  If you want to move forward I will meet with

the building inspector before I leave for vacation and I could have the crew complete all the

necessary interior demolition while I am away. . .We bill for actual costs so this [pricing] is a

maximum unless you change the scope or we find unforeseen hidden issues beyond what we

have outlined."

12.     The Randalls did not accept the Original Proposal until after Mr. Chapdelaine

returned from his vacation, at which time Mrs. Randall told him they wanted to proceed and that

she was sending him a deposit check, dated February 22, 2017.  By the time Mr. Chapdelaine

received Mrs. Randall's "go ahead", the ambitious mid-May probable completion date referred

to in Mr. Chapdelaine's January 30, 2017 email was already three weeks out of date.  The first

day of Stonebridge's work was February 23, 2017.

13.     Mrs. Randall informed Mr. Chapdelaine multiple times that she preferred to

communicate by telephone even after he explained the reasons why he preferred to rely primarily

on emails. He explained that in his experience communicating with clients by email or text

message was more effective and efficient than phone calls and minimized the interruption of

day-to-day work. Electronic communications also had the benefits of enabling him to easily track

decisions and the progress of Stonebridge's work and send his clients progress photos that he

took nearly every workday. Throughout Stonebridge's work at the Hines Point Property, Mrs.

5

Randall primarily communicated her decisions, questions, and comments by telephone; Mr. Chapdelaine relied on a mix of text messages and emails to supplement his conversations with her.

14.     On February 21, 2017, Mrs. Randall sent Mr. Chapdelaine a lengthy email.  After repeating that she was "on board with doing the [interior] stairs, getting rid of elevator and trying to get more space in the downstairs bedrooms [and] I also want to change the two upstairs bathrooms", she posed several questions: "Should we demo the wall between kitchen and LR if we are not doing the kitchen now?"; "what do we do about the outdoor shower and the outside staircase that connects the patio and the deck?"; what was the cost of adding more windows to the project; and how could the house's two street entrances be changed to be "aesthetically pleasing"?  The Original Proposal did not include any of the items noted in her questions.

15.     When Mr. Chapdelaine reminded Mrs. Randall that items not part of the Original Proposal would be billed based on time and materials, her only response was urging him to proceed with preparing a second proposal—the projects that became the Expanded Scope (see below). Their conversation is an example of the pattern of communication between Mrs. Randall and Mr. Chapdelaine that persisted throughout the months that Stonebridge worked essentially non-stop on renovating the Hines Point Property from top to bottom. Mrs. Randall called him multiple times each week, often daily and more than once a day.  Typically, she invariably initiates her calls with a question--"what if we do X?" or "what about Y?"—where "X" and "Y" were extras or upgrades, not part of the parties' existing agreement.  Sometimes she asked for an estimate—which Stonebridge invariably provided if circumstances reasonably allowed; sometimes she acknowledged that the additional work she was requesting was beyond the scope of the Original Proposal or the Expanded Scope; most often she simply issued instructions

6

signifying her implicit authorization for Stonebridge to perform the additional work, saying "the house deserves it."

16.    On February 26, 2017, after numerous phone conversations, Mr. Chapdelaine emailed the Randalls a second estimate for specific additional renovation work ("Expanded Scope").  As he had done with the Original Proposal, Mr. Chapdelaine summarized the Expanded Scope in his email and sent detailed information in Excel format that broke down the four major elements—installing twenty-three additional windows throughout the house (thus increasing the original thirteen to thirty-six; subsequently she added ten more new windows bringing the total to forty-six), retiling the lower level floors, installing new wood flooring on the main floor, and remodeling the kitchen, laundry and adding a half bath—by work tasks, labor costs, subcontractor estimates, and materials' estimates.  The Expanded Scope stated Stonebridge's maximum prices for the specified work and again reflected a 5% overhead and profit factor.  On March 7th, Mr. Chapdelaine modified the pricing for the Expanded Scope to reflect updated information about the cost of remodeling the kitchen and laundry and adding a half bath.  The estimated maximum price for the Expanded Scope as modified was $260,191.08, making the new total cost of performing both the Original Proposal and the Expanded Scope $569,057.51 (*i.e.* $308,866.43 + $260,191.08).

17.    The email that Mr. Chapdelaine sent on February 26, 2017 with the Expanded Scope noted certain "other considerations".  These were items that he and Mrs. Randall had discussed that would further impact the overall project timeline but were still undecided: "interior contents and set up, window treatments, increase the deck size, living room ceiling, outside shower and deck stairs".  Ultimately, Mrs. Randall requested that Stonebridge perform all of these extra items and more.

7

18.     Mr. Chapdelaine reminded Mrs. Randall that the decision to more than double the number of new windows to be installed from the number specified in the Original Proposal would trigger a review by Tisbury's Site Planning Board Site Plan Review Committee and require a lengthy written submission to the Planning Board. The Randalls requested that he move forward with the work and proceed with the additional permitting tasks on the assumption they would receive Planning Board approval for the additional windows.  Mrs. Randall personally sourced, ordered and purchased all of the additional windows; she selected a New Hampshire vendor so the Randalls could avoid paying Massachusetts' sales tax.

19.     Mrs. Randall decided that as a way to control costs, she would also personally purchase key materials for the project in addition to purchasing the windows: the cabinetry for the kitchen and bathrooms from a New Jersey company; all of the flooring tile and stone for the counters; and the wood flooring.  Because Mrs. Randall's direct involvement in the ordering of materials would inevitably affect the pace and completion of the work defined in both the Original Proposal and the Expanded Scope, Mr. Chapdelaine explicitly reminded her in early March that the timing of her purchases would directly affect the pace of Stonebridge's work. Mr. Chapdelaine stressed to Mrs. Randall multiple times that order lead times for the items for which she was assuming supply responsibility were critical to the pace of Stonebridge's work progress.

20.     For example, Mrs. Randall chose custom rather than stock cabinets, with inset doors rather than overlay doors as Stonebridge had proposed, to avoid humidity issues and to control costs.  Mrs. Randall decided instead to replicate the look of the cabinetry in her New Jersey kitchen, a considerable price upgrade over what Stonebridge had proposed, and to use that type of cabinetry in the bathrooms and laundry rooms as well. Mr. Chapdelaine reminded her that the typical lead time from order placement to delivery alone for such custom orders was

eight to ten weeks, with installation including countertops requiring an additional three to four

weeks. Mrs. Randall nevertheless attempted until very late in April 2017 to source the cabinetry

through a New Jersey supplier. At the end of April, she switched gears and instructed Mr.

Chapdelaine to order the cabinets from his Martha's Vineyard based supplier. He did, and that

delay set back work on several elements of the renovation work, as the cabinets were not

delivered to the Hines Point Property until July 1st.

21.     Beginning in late February 2017 and continuing throughout Stonebridge's work,

the Randalls added an expansive array of renovation projects and upgrades ("Upgrades") beyond

the scope of the renovation work defined in the Original Proposal and the Expanded Scope.

Most of these Upgrades had been added to Stonebridge's workload by early May 2017 and

included the following: adding a shower in the second bathroom being remodeled; completely

renovating the full bathroom on the lower level; adding a custom window in the master bathroom

shower; adding wall tile in every bathroom and the laundry room; installing 47 recessed lighting

fixtures throughout the house, relocating and rewiring light switches when the hallways were

widened and stairwell was redesigned, upgrading the smoke detection system, and adding new

appliances and other items that increased the house's overall electrical load requirements;

building custom bookcases in the study/den flanking the existing fireplace chase and a recessed

area for a wall-mounted television; renovating the main floor front entry foyer by removing

existing windows and building an owner's closet and custom entry bench over the space

uncovered when elevator removed; widening and building arched openings between several

additional main floor rooms; boxing the ceiling beams in  the living room and master bedroom;

widening lower level hall; adding a second laundry room on lower level; replacing all of the

decking outside and rebuilding the outside stairs; refurbishing the existing metal fireplace by

reducing the height of the hearth, adjusting the chimney height at the roof, remodel the surround and convert the fireplace to gas; and finishing the water damage repairs to the lower level family room that another contractor had started but not completed.

22.     The Randalls added yet more Upgrades during the Summer—*e.g.*, rebuilding/renovating the two street entrances; adding furniture toekicks to all of cabinets; removing and replacing all of the cabinet knobs and drawer pulls on the dining room credenza (finish change); changing the height of the kitchen cabinet shelves from the factory placement so they aligned with the muttin bars in the glass door panels; upgrading the dining room built-ins; removing and replacing all of the door hinges two separate times (finish change); power washing and clear coat sealing the shingles; and installing new downspouts to divert rainwater and snow melt away from the house.

23.     Stonebridge also encountered unforeseen conditions during the course of construction--such as uncovering rot when old windows were removed—and that led to other additional renovation work.  Additional renovation work relating to unforeseen conditions included the installation of structural beams in the garage to support the kitchen floor; leveling the floors on the lower level and in the kitchen to ensure new tile would lay flat; resurfacing portions of the roof; and rebuilding the exterior staircase.

24.     Each of the added renovation elements generated its own increases in specific labor and materials costs; they also had ripple effects on and caused significant increases in other renovation costs.  These underlying added costs showed up in the following categories of work: framing, drywall, support and finish carpentry, plumbing, tile work, additional electrical work (rewiring, additional service capacity and Code compliance), exterior painting, and project management.

10

25.     Upon information and belief, Mr. Randall knew of all the Upgrades and additional work that Mrs. Randall had instructed Stonebridge to perform. Both Mr. and Mrs. Randall knew that the changes that Mrs. Randall had requested added time to the project as well as additional costs.

26.     Mr. Chapdelaine sent an itemized color-coded Excel spreadsheet on April 7, 2017 that specifically identified the additional work that Stonebridge had already begun through March (the billing period), based on employee timecards, his daily summaries, materials invoices and subcontractor invoices.  Mr. Chapdelaine explained in the email he sent with the April 7, 2017 invoice that he had provided extensive detail about Stonebridge's work to enable the Randalls to "see where your money is going" and to give them "a clear vision of how costs are incurred and accounted for."  The April 7 invoice specifically noted in several places, "[t]his cost will increase with the increase in scope of the additional work."  Mrs. Randall thanked him for all the detail; the Randalls paid the invoice without commenting on any of the additional costs.

27.     The Randalls made at least nine in-person visits to the Hines Point Property during the period of April through Labor Day weekend and two visits after Labor Day.  Mr. Chapdelaine also regularly communicated with Mrs. Randall—by text message and telephone—throughout the Summer keeping her informed about the progress of Stonebridge's work, providing estimates for some of the additional work she requested and discussing specific cash flow needs for deposits (materials and tradesmen).  During the period February through October 2017, Mr. Chapdelaine sent the Randalls hundreds of progress photos to keep them informed about the pace and substance of Stonebridge's work.

28.     Mrs. Randall frequently sent Mr. Chapdelaine text messages praising the quality of Stonebridge's renovation work.  For example:  April 22 – "The house has had a beautiful

11

transformation. It looks wonderful"; June 1 – "the house looking wonderfully transformed"; June 27 – "Wow terrific progress"; July 14 – "Thanks for your time today—it helped to talk as your insights on fireplace were great and made terrific sense"; July 17 "You are doing a fantastic job – it looks wicked awesome";  July 30 – "I am so glad you changed the fireplace – it makes a tremendous difference in the room"; September 4 – ". . . the girls were talking about how amazing the house looks. Emma turned to Lucy and said 'I must tell you, Mr. Chapdelaine is a true genius.'"

29.     The changes in scope of the renovation work that had the greatest impact on the overall price of the Randalls' project were the following: the complete redesign of the interior stairwell from what was reflected in the Original Proposal (changing the height of each stair from standard height, increasing the length of the run, increasing the number of balusters from two to three per tread, and adding wainscoting); widening additional room transitions and hallways, lowering ceiling heights and boxing in the ceiling beams in two rooms; fully renovating a third full bathroom; rebuilding the two street entrances; increasing the existing electrical load (*e.g.*, having 47 recessed lights installed rather than owner-supplied surface mounted fixtures and relocating switches); requiring the purchase and installation of new milled nine-piece interior trim for the new windows and doors rather than having Stonebridge reinstall the flat four-piece interior trim it had carefully removed, cleaned and inventoried so it could be reused as the Randalls initially requested; power washing and sealing the entire exterior of the house; and changing the layout and other design elements of the lower landing and steps to the new bluestone patio three times—twice after the staircase was built—to suit the Randalls' design preferences.

30.     Throughout the Spring and Summer of 2017, Stonebridge personnel including Mr. Chapdelaine worked continually on the Randall project. He regularly worked alongside Stonebridge's other employees into evenings and on weekends, did not take any vacation time, and barely took any time off to deal with two major family crises. In addition to construction tasks, Mr. Chapdelaine agreed to Mrs. Randall's request that he negotiate with her flooring supplier about the inferior product that it had been supplied, and he regularly answered her questions about interior design decisions (*e.g.*, would a certain table fit in the remodeled kitchen, would a certain bed fit in the bedroom, or which shade of gray paint would complement the additional light being introduced through the new windows?). He worked continuously despite the pain of a torn elbow tendon (not diagnosed until October).

31.     Stonebridge worked virtually exclusively on the Randall project from February through August 2017, taking on no "construction" clients and deferring work requested by existing clients. For seven months, the prime construction season, Stonebridge only worked on the Randall project and a few short emergency service projects for established clients.

32.     The Randalls made the progress payments that Mr. Chapdelaine requested without any comment through the end of August 2017. The first time the Randalls expressed any "concern" to Mr. Chapdelaine about the amount of increased renovation costs was in an email that Mrs. Randall sent on September 2nd, two days before Labor Day. The Randalls were coming to Martha's Vineyard for the holiday weekend and had already been informed that Stonebridge's renovation work at the Hines Point Property would be "substantially complete" as of Labor Day. While some work was done by Stonebridge employees after Labor Day to complete some of the Upgrades that the Randalls had requested—*e.g.*, changing shelf heights in the kitchen cabinets, installing the new kitchen cabinet hardware that Mrs. Randall ordered on

13

August 17, installing toekicks that Mrs. Randall ordered after the cabinets were installed,

installing hardware for the dining room credenza that Mrs. Randall ordered on October 17, and

finishing the built-in bookcases—the only major project still unfinished as of Labor Day was

rebuilding the outside staircase from the deck to the stone patio.

33.      Mrs. Randall was aware that the total payments she had made as of the end of

August did not nearly equal the costs and charges of Stonebridge's renovation work. When Mrs.

Randall asked Mr. Chapdelaine the day before the Randalls came to Martha's Vineyard for that

holiday weekend for an accounting, he responded that it would take him at least two weeks "to

pull everything together" for an up to date project accounting; he did not speculate how long it

would take him to translate the backup information into an invoice.  At the end of the Randalls'

several hour Labor Day visit to the Hines Point Property with Mr. Chapdelaine, Mrs. Randall

took him aside, standing next to her car out of everyone else's earshot and asked, "how much am

I going to owe?"  He responded, "It is a lot of money; north of $200 thousand"—but he did not

ask for any payment at that time.  She nodded and walked to the rear of her car without making

any comment.  Later that same day, she sent him a laudatory text repeating again her family's

appreciation for how "amazing the house looks".

34.      Throughout October 2017, Mrs. Randall continued to order items that Stonebridge

needed to complete the renovation project; however, she failed to make critical decisions –*e.g.,*

what lighting fixtures to hang above the kitchen island, above the kitchen table, above the

bathroom vanities, in the dining room and outside; where the electrician should install the ground

fault receptacles in the master bathroom and laundry room; where to mount towel bars in the

bathrooms and whether to change the trim in the master bathroom shower to match the mixing

valve or change the location of the mixing valve itself.

14

35.     In October 2017, Mrs. Randall notified Mr. Chapdelaine "the house needs to be finished at least two weeks prior" to Thanksgiving.  Mr. Chapdelaine assured her that the work could be completed by November 10th so long as she finally made a firm and final decisions about what she wanted in the master bathroom shower.  Mrs. Randall had continually changed her mind about the design of the master bathroom shower even after it was essentially finished.  As of November 10, 2017, Mrs. Randall had still not made a firm decision.  Moreover, the Randalls also did not come to Martha's Vineyard for Thanksgiving.

36.     Mr. Chapdelaine's preparation of a detailed accounting was delayed as the result of his extensive "hands on" work on the Randall's project (at the expense of his customary "office" time); certain personal issues and a computer glitch that resulted in the need for a re-entry of data that had previously been entered onto the computer also somewhat contributed to the delay.  Nevertheless, on November 21, 2017, completed his detailed accounting of Stonebridge's work and project expenses during the period from April 7 through November 17, 2017. As of the latter date, Stonebridge had completely finished all of the renovation work that had not been completed by Labor Day—the principal item in that latter category had been the outside staircase—and most of the punch list items Stonebridge had identified, the ones that Mrs. Randall had requested, and the ones the Randalls pointed out with blue painter's tape during their Labor Day visit.

37.     The November accounting document was, like the April 7, 2017 accounting document, in Excel format and meticulously detailed.  It specifically identified costs related to the Original Proposal, the Expanded Scope of the project, all of the Upgrades, and extra work necessitated by unforeseen conditions.

38.     The November 21, 2017 accounting (as corrected on December 8th) shows the following information:

| | Original Proposal | Expanded Scope (3/7/2017) | Owner-added extras and unforeseen conditions | Totals |
|---|---|---|---|---|
| Estimate | $308,866.43 | $260,191.83 | Time and materials | |
| Actual amounts billed by Stonebridge* | $257,473.15 | $166,356.32 | $439,515.59 | **$863,345.04** |
| Value of Owner-supplied materials** | $22,050.00 | $76,376.49 | N/A -reflected in time and materials | |
| Total Amount Paid to Stonebridge by Randalls | | | | **$597,845.00** |
| Net Amount Owed by Randalls | | | | **$265,500.04** |

\* - Amounts billed did not include Owner-supplied items

\*\* - These are the Stonebridge allowances in Original Proposal and Expanded Scope for items the Randalls supplied.

39.     Mr. Chapdelaine emailed the accounting to Mrs. Randall on November 22, 2017. After explaining how the accounting was organized and what information it contained, his email stated, in pertinent part,

As you know the scope of the work increased considerably with many additions to the project . . . I have kept the cost plus 5% formula throughout the billing format which translates into a substantial savings, our normal billing is 'cost plus 15%'. Originally this was intended for the original project of the stairs, master bath and lower bedroom reconfigurations. I then extended it to include the kitchen portion. I also did not add 5% to the value of the Owner provided products, windows, flooring, tile .... a further savings for you.  Given the project extended from an anticipated completion of mid June into

16

early October this savings to you comes at loss of income for me. We, the crew and the subs have worked diligently to provide you with a great value, quality workmanship and a new home we hope brings you and your family years of enjoyment . . . Certainly you will need time to review the invoice however a partial payment is needed and would be appreciated as all of the subs are due a portion of the remaining balance.

40.     When Mrs. Randall and Mr. Chapdelaine spoke briefly on November 30, 2017, she told him she was not ready to discuss the accounting and he did not press her.  Instead, she complained about the shower controls layout, the type of sealer used on the exterior shingles, and the log selection for the gas fireplace.  Mr. Chapdelaine reminded her that she had been involved in those decisions but agreed to think about a way to resolve the disagreements on her other points. A few days later he sent her a proposed new layout for relocating the shower controls reiterating his previous proposal that Stonebridge would not charge for its labor or materials costs to making that change, but only charge for the plumber's and painters' time. She failed to respond. On December 4, 2017, he sent her an email proposing several "proportionate" and specific retainages pertaining to the sealant, the gas log selection and the other items she had questioned.

41.     Mr. Chapdelaine's December 4, 2017 email reminded Mrs. Randall that "you knew the scope of the project was increasing and cost would be associated with these additions and changes".  He also told her that Stonebridge had already performed nearly $8,000 of punch list work that he classified as "unbillable 'final detail'" . . . to meet both your expectations and my standards of craftmanship"; and reiterated that "the project is well beyond substantial completion." Mr. Chapdelaine acknowledged that "the final invoice was late" but also reminded her he had disclosed the serious "personal issues that contributed to" that timing. She did not respond to his email.

17

42.     Stonebridge continued to perform punch list work during December 2017 and January 2018 even though the Randalls had not yet made any payment om the November invoice, and Mr. Chapdelaine kept Mrs. Randall informed of that work.  On December 8, Mr. Chapdelaine re-sent the November 22, 2017 invoice corrected to reflect a payment by the Randalls he had inadvertently omitted.  On January 24, 2018, he sent Mrs. Randall an email noting the last few punch list items that remained due to persistent backorders and a vendor error, with an new iteration of the November 22 invoice that included freight charges that Stonebridge had paid for items she ordered and that for the first time reflected a "finance change in the amount of $3,994.82 on the open balance from December 22, 2017."  Three days later, on January 27, 2018, Mrs. Randall sent Mr. Chapdelaine an email and a duplicate text message, stating in pertinent part, "I do not want any further work being done at my house (by you, your employees or your subcontractors) until you and I have had a chance to review the final invoice."  In his January 27th response, Mr. Chapdelaine texted "[p]er your request we will not enter your home without your permission."  In her reply, she confirmed, "I will be in touch."  The Randalls' next communication with Stonebridge was a c. 93A demand letter.

43.     The main premises of the demand letter were that Stonebridge had abandoned the Hines Point Property renovation after Labor Day, was seeking payment of hundreds of thousands of dollars for work to which the Randalls never agreed, and performed substandard work. The facts belie each of these self-serving accusations.

44.     The allegation in the c 93A demand letter that Stonebridge abandoned the Hines Point renovation is demonstrably false.  Stonebridge personnel, including Mr. Chapdelaine, worked approximately 650 manhours during August to complete the renovations so the house would be substantially complete when the Randalls came to Martha's Vineyard for the holiday

18

weekend. The sole renovation work of any magnitude that was incomplete was the exterior

stairs—which were not the sole means of accessing the patio from the house and which

Stonebridge personnel ultimately built/rebuilt three times to suit the Randalls' preferences. When

the Randalls at the last minute decided they did not want to stay at the Hines Point Property

during the Labor Day weekend because much of their new furniture was not going to be

delivered in time, Mr. Chapdelaine arranged for them to stay in a house that Stonebridge then

owned at no charge. He then spent several hours on the holiday walking through the Hines Point

Property with the Randalls and their children.  Each of the Randalls expressed delight with how

Stonebridge had transformed the house.

     45.    From Labor Day through the date of the final invoice, Stonebridge personnel

continued to work diligently at the Hines Point Property primarily on exterior projects.  They

worked more than 300 manhours (not counting) primarily in September—completing the

exterior staircase, installing gutters to prevent future water damage and rot, and power-washing

and restaining the shingles—often working eight to ten-hour days. Approximately half of those

hours—150 manhours—were devoted exclusively to work on the exterior stairs.  The post-Labor

Day hours noted do not include Mr. Chapdelaine's 40 plus hours of project management work—

including his making design suggestions and generating sketches that Mrs. Randall solicited and

his acting as the receiving agent for the Randalls' new furniture; those hours also does not reflect

the more than 100 manhours on punch list work for which the Randalls were not billed.  The

painters worked more than 100 hours after Labor Day on the house exterior and repainting rooms

at Mrs. Randall's request. When the Randalls visited the Hines Point Property twice in October,

the changes that Stonebridge personnel continued to make after Labor Day were obvious.

46.     The "punch list" attached to the demand letter is comprised almost exclusively of items that the Randalls prevented Stonebridge from completing as a result of the Randalls' own failures to select locations or provide long-promised materials.  The Randalls' list also does not accurately reflect the punch list work that Stonebridge personnel did perform.

47.     The demand letter conceded that Mr. Chapdelaine's January 30, 2017 email—the parties' very first substantive written communication—stated in plain language that the Original Proposal "is a maximum unless you [the owners] change the scope or we find unforeseen hidden issues beyond what we have outlined."  The demand letter nevertheless asserted that Stonebridge never "advised" the Randalls of the "expanding scope of their project."  That assertion is demonstrably false.

48.     Stonebridge's work was of the highest quality and not even remotely sub-standard.  The allegation that Stonebridge's work was substandard is particularly incongruous given the language used to describe the quality of Stonebridge's renovation work that is contained in the real estate advertisements about the Hines Point Property that have been published since January 2018.

49.     The sole example that the Randalls' attorney used to illustrate his accusation that Stonebridge's work was substandard—the condition of the main level's new wood flooring—is particularly telling.  In January or February 2017, Mr. Chapdelaine had specifically pointed out that because the Hines Point Property abutted Lagoon Pond the house was highly susceptible to the ubiquitous moisture laden environment. Mrs. Randall made clear from the start of the project that she did not use the main floor's existing air-conditioning system because the Randalls liked to have all the windows open to the breeze off Lagoon Pond. The Randalls also declined to consider Mr. Chapdelaine's suggestion that they install a dehumidification system for the main

floor like the system being installed on the lower level.  Similarly, they refused to consider his suggested installation of a humidification system for the winter months to counteract the severe drying generated by their radiant and forced hot air heating systems, which had caused observable wood trim shrinkage. To accommodate the Randalls' decisions and to ameliorate some of the potentially severe moisture challenges that Mr. Chapdelaine knew the house had because of its location, he recommended a high-quality engineered wood product for the new flooring on the main floor and gave Mrs. Randall specific product information so she could see it for herself. One of the things he point out was that engineered wood flooring could be refinished to the same extent as solid wood. Mrs. Randall nevertheless insisted on solid wood flooring and sourced it herself.  As it turns out, she selected a low-grade product.

50.     The experienced flooring installer Stonebridge engaged adhered to every manufacturer's specification and used the techniques and materials which in his experience were the best for minimizing the effects of atmospheric moisture. While the other main floor renovations were being completed, the finished floor was covered with two layers of industrial grade protection. When the protection was removed in early August 2017, it was obvious that the main level floorboards had "cupped" to varying degrees in multiple locations.  Mrs. Randall's reaction at that time was that the cause was the product supplied, not the workmanship.  She asked Mr. Chapdelaine to speak with the supplier's representative, seeming to expect that replacement flooring would be offered. The supplier's representative first insisted to Mr. Chapdelaine that the flooring must have been installed with the wrong adhesive or without sufficient spacing from the walls.  Mr. Chapdelaine debunked those suggestions with photographs of the as-installed spacing and the (then) current moisture content readings that showed the flooring as installed was well within the range of moisture tolerances the

manufacture recommended.  The supplier had no other suggestion for remedying the problem and expressed hope that the flooring would "lie down" after the first heating season.  That phenomenon had not occurred by January 27, 2018, even though heat-induced shrinkage of the new trim—which the painters had started to remedy—had already occurred. The Randalls saw the condition of the flooring when they visited the house on Labor Day and twice in October, but never asked Mr. Chapdelaine to address it.

## Count One – Breach of Contract

51.     Stonebridge hereby repeats and incorporates by reference each and every allegation in the foregoing paragraphs 1-50 as if fully set forth herein.

52.     The Randalls and Stonebridge entered into an enforceable contract for the Hines Point Property renovation on or about February 22, 2017; to wit, the date of the Randalls' deposit check for the work specifically described in the Original Proposal.  The parties' agreement was not limited to the work noted on the Original Proposal or also the Expanded Scope.  The parties' agreement also included—as noted on the face of the Original Proposal—any additional work and upgrades that the Randalls thereafter requested and work required to remedy unforeseen conditions Stonebridge encountered during construction that would be charged based on "time and materials."

53.     Beginning on or about February 21, 2017 and continuing throughout Stonebridge's renovation work, the Randalls changed and expanded the scope of the renovation work agreed upon by the parties; to wit, by authorizing the work specified in the Expanded Scope and by requesting numerous additional changes and upgrades in the renovation work both inside and outside their home.  The scope of the parties' contract also expanded due to

unforeseen conditions that Stonebridge encountered during construction and brought to the Randalls' attention.

54.     Initially, Mrs. Randall asked Mr. Chapdelaine to consult with Joan Boone about the renovations. Fairly soon after Stonebridge began its work, Mrs. Randall ceased asking Mr. Chapdelaine to consult with Ms. Boone and upon information and belief, Mrs. Randall relied exclusively on Mr. Chapdelaine's design suggestions and her own design decisions. Stonebridge correctly and completely performed every design and construction element of the parties' contract.

55.     The Randalls have refused and failed to pay the net amount reflected in Stonebridge's November 21, 2017 invoice, as corrected: $265,500.

56.     The Randalls intentionally prevented Stonebridge from completing punch list items and barred Stonebridge personnel and tradesmen from the Hines Point Property.

57.     The Randalls' refusal to allow Stonebridge to complete the punch list work and the Randall's refusal to pay the outstanding amount due Stonebridge for the renovation work that it performed constitute material breaches of the parties' contract, as a result of which Stonebridge has suffered damages in an amount to be determined at trial.

### Count Two -- Breach of Covenant of Good Faith and Fair Dealing

58.     Stonebridge hereby repeats and incorporates by reference each and every allegation in the foregoing paragraphs 1-57 as if fully set forth herein.

59.     Every Massachusetts contract contains an implied covenant that both parties will act in good faith toward each other and deal with each other fairly.

60.     The Randalls instructed and demanded that Stonebridge continue to perform extensive construction work throughout the time Stonebridge worked on the Hines Point

Property that the Randalls knew was beyond the scope of the Original Proposal and Expanded Scope.

61.    Upon information and belief, the Randalls had no intention of paying Stonebridge for the extra work they had requested or that had been required to remedy unforeseen conditions. The Randalls have benefitted from all of Stonebridge's work for which they have failed and refused to pay in full.

62.    The Randalls' failure and refusal to pay Stonebridge in full for all the work that Stonebridge performed constitutes a breach of the covenant of good faith and fair dealing, for which Stonebridge has suffered damages in an amount to be determined at trial.

### Count Three – Unjust Enrichment/Quantum Meruit

63.    Stonebridge hereby repeats and incorporates by reference each and every allegation in the foregoing paragraphs 1-62 as if fully set forth herein.

64.    Stonebridge substantially performed all of the construction work at the Hines Point Property for the Randalls' renovation project.  The Hines Point Property renovation project was substantially complete as of Labor Day 2017 and except for a small number of punch list items was entirely complete by November 21, 2017.

65.    If and in the event that a court finds that Stonebridge did not substantially complete the renovation work at the Hines Point Property, that circumstance was due entirely to the Randalls' ordering Stonebridge to cease all work as of January 27, 2018.

65.    Stonebridge has paid in full all of the charges for labor, materials and tradesmen's time that are set forth in the November 21, 2017 invoice as corrected on December 8, 2017.

67.    The Randalls have been unjustly enriched not only by the $265,500 shown on the November 21, 2017 invoice, but also by Stonebridge's loss of its usual 15% charge for profit,

24

which represents the fair and reasonable value of extra work the Randalls demanded and the fair and reasonable value of punch list items that Stonebridge performed without billing for the sole purpose of seeking to get the Randalls to pay what they should have paid under the terms of the parties' contract.

68.     If and in the event a court determines that Stonebridge is not permitted to recover under the parties' express contract, then Stonebridge is entitled to recover under the theory of *quantum meruit* because the Randalls will be unjustly enriched unless they are required to pay Stonebridge the fair and reasonable value of Stonebridge's renovation work.

**WHEREFORE**, Stonebridge asks that the Court

A.     Enter a judgment on the merits in its favor on Count One and award it damages of $265,500 plus prejudgment interest at the statutory rate from and after December 8, 2017;

B.     Enter a judgment on the merits on its favor on Count Two and award it the damages it has incurred as a result of the Randalls' breach of the covenant of good faith and fair dealing plus prejudgment interest;

C.     Enter a judgment on the merits in its favor on Count Three and award it damages of an amount to be determined by the court plus prejudgment interest at the statutory rate from the date of demand; and

D.     Award such other and further relief as the court deems meet and just.

## JURY TRIAL DEMAND

The Plaintiff hereby demands a trial by jury on all issues to which it is entitled as a matter of right.

Respectfully submitted,
STONEBRIDGE BUILDING & DESIGN, INC.
By its attorneys

Hilary S. Schultz, BBO #447640
hschultz@schultzlawllp.com
Schultz Law, LLP
231 Chief Justice Cushing Highway, Suite 203
Cohasset, MA 02025
617 951 9980 (t)

Dated:  December 9, 2020

26